UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES <br><br> v. <br><br> (1) HERIBERTO PEREZ, <br> (2) BRIAN FRIAS-BURGOS, and <br> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br><br> Defendants | M.J. No. 25-4107-DHH <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Robert Jacobsen, being duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I have been so employed since November 2017. Prior to starting as a Special Agent, I received fifteen weeks of criminal investigator training at the Federal Law Enforcement Training Center and seventeen weeks of training at the ATF National Academy in Glynco, Georgia. Before joining ATF, I worked for two and one-half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia. I began as a patrol officer, responding to calls for service and investigating violations of state criminal law, and later served as a member of the Special Operations Unit, a full-time special weapons and tactics ("SWAT") team. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.  As part of my duties as an ATF Special Agent, I have investigated federal firearms violations, including participating in the controlled purchases of firearms, surveillance of firearms

1

traffickers, interviews of suspects, participating in search warrants, and electronic surveillance. I have investigated firearms trace data, cellular phones, and email accounts with which firearms sales are facilitated. I have also participated in many aspects of drug and money laundering investigations, including physical surveillance, undercover narcotic purchases, surveillance of undercover transactions, the introduction of undercover agents and cooperating witnesses, the execution of search and arrest warrants, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, as well as my discussions with experienced agents and investigators, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

## PURPOSE OF AFFIDAVIT

3.  I make this affidavit in support of a criminal complaint against Heriberto PEREZ ("PEREZ"), Brian FRIAS-BURGOS ("FRIAS-BURGOS"), and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, charging that, between on or about September 2024 and October 2024, PEREZ, FRIAS-BURGOS, and ▇▇▇▇▇▇▇▇▇▇▇▇ conspired with each other and with others known and unknown to distribute controlled substances, in violation of 21 U.S.C. § 846 (the "Charged Offense"). Based on the facts set forth in this affidavit, there is probable cause to believe that PEREZ, FRIAS-BURGOS, and ▇▇▇▇▇▇▇▇▇▇▇▇ have committed the Charged Offense.

4.  The facts in this affidavit come from my personal observations and review of records,

information obtained from other investigators, and my training and experience. This affidavit is submitted for the limited purpose of demonstrating probable cause for the criminal complaint and does not set forth all of my knowledge about this matter. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. All times herein are approximate. Any descriptions of recorded conversations described below are intended as summaries only, and not verbatim transcriptions of the recorded conversations. Where parts of any of those conversations took place in Spanish, the Spanish-language conversations have been translated for me by Spanish-speaking investigators.

## PROBABLE CAUSE

### Background of Investigation

5. Beginning in around July 2024, ATF began investigating a firearms and drug trafficking organization based in Boston. ATF agents received information from a cooperating source ("CS")[1] about an individual who is selling large quantities of drugs and firearms in Boston known to the CS as "Bryan." The CS provided agents with a telephone number of a cell phone used by "Bryan." At the direction of agents, the CS communicated with the user of that telephone and completed controlled purchases of narcotics from that individual. Based on those controlled purchases, as well as a review of PEREZ's driver's license photograph on record with the

---

[1] The CS has been an ATF confidential source since 2017. During that time, the CS has provided reliable information that has led to arrests, as well as seizures of drugs and firearms. The CS is cooperating in exchange for monetary compensation. The CS has a criminal history that includes arrests for drug offenses, assault, and motor vehicle offenses. The CS has a proven track record of providing reliable information which has led to the seizure of firearms and narcotics, and that has been corroborated where possible. Accordingly, I believe that the information provided by the CS is reliable.

3

Massachusetts Registry of Motor Vehicles ("RMV"), agents identified the user of that telephone as Heriberto PEREZ.[2]

6. In late August 2024, agents introduced an undercover ATF agent ("UC-1") to PEREZ for the purpose of arranging undercover purchases of controlled substances, including cocaine and methamphetamine.

### September 5, 2024, Undercover Purchase of Methamphetamine from FRIAS-BURGOS; Arranged by PEREZ

7. On September 5, 2024, UC-1 communicated with PEREZ via telephone to confirm the purchase of one pound of methamphetamine from PEREZ from $2,500. PEREZ confirmed to UC-1 that he was ready to conduct the transaction and provided UC-1 with a meeting address of 46 Washington Street in Dorchester, Massachusetts. UC-1 told PEREZ that UC-1's girlfriend would be conducting the transaction for UC-1, and PEREZ told UC-1 that either his wife or his nephew would be delivering the drugs at the transaction.

8. On August 26, 2024, another ATF undercover agent ("UC-2"), posing as UC-1's girlfriend, prepared to conduct the methamphetamine transaction with PEREZ. At around 11:30 a.m., along with investigators conducting surveillance, UC-2 travelled to the meeting location in an undercover vehicle. UC-2 was equipped with audio and video recording equipment.

---

[2] On September 30, 2024, the Honorable David H. Hennessy issued a warrant authorizing agents to obtain precise location information for this telephone that was used by PEREZ. *See* 24-MJ-4461-DHH. In preparing this affidavit, I noticed an error in the affidavit I submitted in support of that warrant (hereinafter, the "September Affidavit"). Paragraph 16 of the September Affidavit states, "All of the CS communications described below were with the Target Telephone and were consensually recorded and preserved unless otherwise noted." Upon review, I determined that the FaceTime video call referenced in the beginning of paragraph 17, in which "PEREZ informed the CS that he was ready to sell the CS cocaine as previously discussed, and PEREZ instructed the CS to meet him at 27 Washington Street in Dorchester, Massachusetts," was not recorded.

9. UC-2 arrived in the area of the meeting location and parked the undercover vehicle on the corner of Washington Street and Bilodeau Road. UC-2 had UC-1 on speakerphone in the undercover vehicle to relay information, and UC-1 told PEREZ that UC-2 had arrived at the location. Shortly thereafter, investigators observed FRIAS-BURGOS[3] approach the undercover vehicle, and enter the front passenger seat. FRIAS-BURGOS placed a square-shaped package wrapped in green plastic wrap under the front passenger seat, but UC-2 instructed FRIAS-BURGOS to place the package in the center console, which he did. UC-2 then handed FRIAS-BURGOS $2,500 in cash, and FRIAS-BURGOS departed the area.

10. Agents conducted a field test on the substance in the green plastic wrap package, which tested positive for methamphetamine. The net weight, including packaging was over 480 grams. Agents subsequently sent the suspected methamphetamine to the laboratory for testing. The results are pending. Based on experience and training, the physical appearance and packaging of the substance, and the positive field test, I believe the substance to contain methamphetamine.

**October 2, 2024, Undercover Purchase of Cocaine from PEREZ**

11. Between September 14 and October 2, 2024, UC-1 continued to communicate with PEREZ via telephone. During these communications, they discussed PEREZ supplying UC-1 with additional narcotics.

12. On October 2, 2024, at approximately 12:12 p.m., at the direction and under the supervision of agents, the CS placed a video (FaceTime) phone call to PEREZ. This call was not recorded, but was observed by UC-1. During the video call, UC-1 observed PEREZ holding a large

---

[3] As part of the investigation, agents had previously identified FRIAS-BURGOS during a prior controlled purchase on August 21, 2024. Agents obtained the driver's license photograph for FRIAS-BURGOS and confirmed it to be the same individual who met with UC-2 on September 5, 2024.

square-shaped package wrapped in green plastic wrap, which UC-1 believed to be narcotics. PEREZ agreed to meet with UC-1 later that day so that PEREZ could supply UC-1 with additional narcotics. PEREZ directed them to meet at Fernandez Liquor Store, located at 562 Blue Hill Avenue, Dorchester, Massachusetts, and he told them to park on the street.

13. In preparation for the meeting with PEREZ, agents searched the CS for excess money or contraband, with negative results. Both the CS and UC-1 were equipped with recording equipment. Agents conducting surveillance followed the CS and UC-1 to the agreed upon meeting location. Once they arrived, the CS contacted PEREZ to let him know they had arrived. After walking toward the store, the CS received a FaceTime call from PEREZ, during which PEREZ instructed them to cross the street and meet with him in his vehicle.

14. UC-1 and the CS walked across the street and approached a blue BMW SUV. UC-1 observed PEREZ seated in the driver's seat, and a woman PEREZ called his wife ("esposa") seated in the passenger seat. PEREZ told UC-1 and the CS to get in the back of the vehicle. Once UC-1 and the CS were in the vehicle, PEREZ began to drive away and told them they were going to pick up "those things" ("esas cosas") which he said were nearby. While driving, PEREZ told UC-1 that it had been difficult to obtain "ice" ("hielo"), meaning methamphetamine, to sell to UC-1. PEREZ said they had to go pick up the narcotics.

15. While traveling to the undetermined location, PEREZ told UC-1 that he had opened one kilogram of "powder" (meaning fentanyl) the previous day, and that he almost died after inhaling the "powder" and had to administer Narcan to himself due to the exposure. During the drive, the CS told PEREZ that they were willing to purchase a firearm from PEREZ that PEREZ had previously offered to sell, but said that they did not have money for it. UC-1 asked PEREZ how much a Glock firearm sold for in Boston, and PEREZ told UC-1 that he was able to get firearms for

6

approximately $700. UC-1 said that he would be able to resell such a firearm in Chicago for $1,100 to $1,200. During the drive, PEREZ asked the CS if the CS was interested in buying crack cocaine ("dura"), and he noted that he had cooked 250 grams of cocaine ("yo cocine 250"). The CS told PEREZ they were not interested.

16. At approximately 1:53 p.m., they stopped and parked the car and PEREZ went to meet with an unknown male who was in a black Audi SUV. While UC-1 and the CS remained in PEREZ's vehicle, three unknown men got out of the Audi and met with PEREZ. Thereafter, PEREZ went back to his vehicle and asked UC-1 to provide him with "seis," meaning $6,000 to purchase methamphetamine from these men. UC-1 told PEREZ that he wanted to see the drugs before providing any money, but PEREZ assured UC-1 that he would pay UC-1 for any loss of funds if that were to happen. UC-1 then provided PEREZ with $6,000 in official funds and PEREZ took that money and handed it to one of the unknown males, then returned to his vehicle. Two of the unknown males walked toward an apartment complex and then out of view, while the third unknown male drove away in the Audi.

17. After several minutes of waiting, and when no one returned with narcotics, PEREZ placed multiple calls trying to get ahold of the unknown males. When unsuccessful, ultimately PEREZ told UC-1 that he would reimburse UC-1 for the $6,000, and PEREZ told UC-1 he would give him cocaine that he had at his residence.

18. Upon arriving at PEREZ's apartment complex, PEREZ got out of the vehicle, went to the rear of a gray Honda sedan, opened the trunk and retrieved what appeared to be a knotted bag containing suspected cocaine. PEREZ then returned to the vehicle that UC-1 and the CS were in and he provided the bag of suspected cocaine to UC-1. PEREZ told UC-1 "there are three ounces" ("hay estan las tres onces"). Thereafter, PEREZ appeared to go into his residence to retrieve

additional cocaine to provide to UC-1 to account for the $6,000 that the unknown males took. PEREZ got back into the vehicle with UC-1 and the CS and provided UC-1 with an additional approximately one ounce of suspected cocaine.

19. PEREZ told UC-1 that he had spoken with one of his associates and that he would be able to provide UC-1 with five pounds of methamphetamine in the future. PEREZ assured UC-1 that the next time they did a transaction, that PEREZ would have the narcotics in his possession.

20. PEREZ returned UC-1 and the CS back to the location of the liquor store and UC-1 and the CS proceeded to meet with other agents, where they turned over the suspected cocaine and recording equipment. Agents sent the suspected cocaine to a laboratory for testing and analysis. The substances contained in the two bags of cocaine tested positive for cocaine and had a total weight of approximately 117.26 grams.

### October 31, 2024, Undercover Methamphetamine Purchase from ▓▓▓▓▓▓▓▓▓▓▓▓; Arranged by PEREZ

21. Between October 2 and 31, 2024, UC-1 had additional phone communications with PEREZ, during which they discussed additional narcotics transactions.

22. On October 31, 2024, at approximately 12:12 p.m., UC-1 contacted PEREZ to confirm a narcotics transaction planned for later that day. PEREZ agreed to meet with UC-1 to conduct the narcotics transaction and told UC-1 to travel to 80 Walnut Park, Roxbury, Massachusetts. In lightly coded language, PEREZ agreed to sell five pounds of methamphetamine and three ounces of cocaine for $17,100.

23. In advance of the planned meeting, agents equipped UC-1 with an audio/video recording device. At approximately 1:06 p.m., UC-1 drove to the meeting location and placed a call to PEREZ to let him know that UC-1 had arrived. PEREZ told UC-1 he could see UC-1 parked on the street and that he would meet with UC-1 shortly. Less than twenty minutes later, a male later

identified as ▮▮▮▮ approached the passenger side of the UC vehicle carrying a white plastic bag. ▮▮▮▮ got into the front passenger seat of the UC vehicle and told UC-1, "I am Bryan's brother" ("Soy hermano de Bryan"). UC-1 asked where "Bryan" was and ▮▮▮▮ told UC-1 that "Bryan" was down the street. UC-1 then got a phone call from PEREZ who stated that his "brother" ("hermano") had the agreed upon narcotics for the agreed upon price. PEREZ told UC-1 he would meet with UC-1 after the transaction.

24. ▮▮▮▮ handed UC-1 the white plastic bag and UC-1 verified that there were five clear plastic bags containing what appeared to be methamphetamine in each bag, as well as one bag containing what appeared to be cocaine. UC-1 asked ▮▮▮▮ if it was five pounds and three ounces ("los cinco y las tres"), meaning five pounds of methamphetamine and three ounces of cocaine. ▮▮▮▮ said it was, and that "he" (PEREZ) had instructed ▮▮▮▮ to deliver the drugs to UC-1. At that point, UC-1 provided ▮▮▮▮ with $17,100 and ▮▮▮▮ asked UC-1 if "Bryan" (PEREZ) was going to meet with UC-1 following the transaction. UC-1 said yes, and ▮▮▮▮ got out of the UC vehicle and walked on foot out of UC-1's view. UC-1 remained in the area and made multiple calls to PEREZ, but he did not answer.

25. After waiting for a short period of time, UC-1 left the area and proceeded to meet with other agents where UC-1 turned over the suspected narcotics. Agents subsequently sent the

---

[4] Agents obtained information about the vehicle that ▮▮▮▮ arrived in to meet with UC-1. The vehicle was registered to ▮▮▮▮. Through open source search tools, agents learned that ▮▮▮▮ had shared an address with ▮▮▮▮. Agents subsequently obtained the driver's license photograph for ▮▮▮▮ and confirmed it to be the same individual who met with UC-1 on October 31, 2024.

suspected cocaine and methamphetamine to a laboratory for testing and analysis. The results confirm the five (5) bags of suspected methamphetamine tested positive for methamphetamine and had a total weight of 2,185.41 grams and a purity of 99.5% (+/- 3.0%). The lab results confirm the suspected cocaine tested positive for cocaine and had a total weight of approximately 85.70 grams.

## CONCLUSION

26.     Based on the foregoing, there is probable cause to believe that, between on or about September 2024 and October 2024, Heriberto PEREZ, Brian FRIAS-BURGOS, and ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆ conspired to distribute controlled substances, in violation of 21 U.S.C. § 846.

Respectfully Submitted,

*Robert Jacobsen* /RJ/
Robert Jacobsen
Special Agent, ATF

Sworn to by telephone pursuant to Fed. R. Crim. P. 4.1 on **Mar 18, 2025**.

*David H. Hennessy*
Hon. David H. Hennessy
United States Magistrate Judge

10:32 a.m.